560 S.E.2d 612

**L.W. LINDER and Muriel Linder, Petitioners,**

v.

**INSURANCE CLAIMS CONSULTANTS, INC., a/k/a ICC, Inc., Jeffrey Raines, and Gerald Moore, Jr., individually, and as employees/agents of Insurance Claims Consultants, Inc., Respondents.**

**No. 25417.**

Supreme Court of South Carolina.

Heard Sept. 25, 2001.

Decided Feb. 25, 2002.

---

478

Daniel W. Williams, of Bedingfield & Williams, of Barnwell, for petitioners.

Fleet Freeman, of Freeman & Freeman, of Mt. Pleasant, for respondents.

Henry B. Richardson, Jr., and Barbara M. Seymour, of the Office of Disciplinary Counsel, of Columbia, for amicus curiae the Disciplinary Counsel.

Arnold S. Goodstein and Mary Perrin O'Kelley, of Goodstein Law Firm, of Summerville, for amicus curiae National Association of Public Insurance Adjusters.

Elizabeth Van Doren Gray, of Columbia, for amicus curiae the South Carolina Bar.

WALLER, Justice.

We granted petitioners' request to hear this declaratory judgment action in our original jurisdiction. Petitioners seek to have the Court declare that the actions of respondents, as public insurance adjusters, constitute the unauthorized practice of law. A lawsuit between these parties is currently pending in circuit court based on respondents' claim against petitioners for breach of contract. That lawsuit has been stayed pending the Court's decision in the instant matter.

## FACTUAL BACKGROUND

The factual background for this case is both general and specific. We first take a look at the business of public insurance adjusting, in general, and then detail the circumstances surrounding the dispute between the parties.

### Public Insurance Adjusting

■ Insurance adjusting is the business of settling an insurance claim. Black's Law Dictionary defines an "adjuster" as one "appointed to adjust [i.e., settle] a matter; ... One ... who makes any adjustment or settlement, or who determines the amount of a claim." BLACK'S LAW DICTIONARY 27 (6th ed.1991).

■■ First-party public insurance adjusting involves the situation where "an insured hires a public adjuster to assist the insured in filing a claim of loss with its insurer" and is based on contract law. *Utah State Bar v. Summerhayes & Hayden,* 905 P.2d 867, 868 (Utah 1995). Specifically, a first-party adjuster is retained to:

> determin[e] the amount of loss recoverable under the policy. The adjuster documents and measures damages, gathers relevant facts, determines repair or replacement costs, and submits the claim to the insurance company. The adjuster then negotiates with the insurance company, or the insurance company's adjuster, to obtain the best settlement for the insured.

*Id.*

■ In contrast, third-party adjusting involves the situation where a "stranger to the insurance contract" asserts a claim against an insured tortfeasor. *Id.* "In third-party adjusting, an adjuster represents an injured client in making a claim under a liability insurance contract against an insurance company that insures or indemnifies a third person who is or may be liable for the injury caused to the adjuster's client." *Id.* at 870. Therefore, the third-party adjuster "must determine the extent of the liability, rights, and duties of the parties before attempting to resolve the issue of a settlement amount." *Id.* at 868–69.

■ A first-party adjuster is generally considered to be synonymous with the term "public adjuster." According to

the National Association' of Public Insurance Adjusters (NA-PIA), the term "Public Insurance Adjuster" means a representative of an insured regarding the adjustment of an insurance claim for loss resulting from "fire and its allied lines." In its *amicus* brief, NAPIA asserts that the main question a public adjuster is hired to answer is that of "how much?" In that capacity, the public adjuster "documents and measures the damage caused by a property loss to the insured."

Recently, a new South Carolina statute went into effect regulating public insurance adjusting. *See* S.C.Code Ann. §§ 38–48–10 through 160 (Supp.2000). Under the statute, "Public Adjusting" is defined as:

> investigating, appraising or evaluating, and reporting to an insured in relation to *a first party claim* arising under insurance contracts, that insure the *real or personal property,* or both, of the insured. Public adjusting does not include acting in any manner in relation to claims for damages to or arising out of the operation of a motor vehicle. *Public adjusting does not include any activities which may constitute the unauthorized practice of law. Nothing in this chapter shall be construed as permitting the unauthorized practice of law.*

§ 38–48–10(2) (emphasis added). Thus, South Carolina restricts public adjusting to first-party claims involving only real or personal property.[1]

*Facts of the Underlying Lawsuit*

Petitioners ("the Linders") suffered property loss due to a fire at their home in February 1996. While their claim was being adjusted by the insurance company, the Linders had many concerns about how the repairs to their home were being handled. One of the repairmen recommended respondent Insurance Claims Consultants, Inc. ("ICC") to Mrs.

---

1. Additionally, the statute, *inter alia:* sets forth licensing requirements (§§ 38–48–20 through –60); provides standards of conduct for the public adjuster (§ 38–48–70); regulates the written contract (§ 38–48–80); prescribes the manner in which a public adjuster may advertise (§ 38–48–100); and authorizes the Department of Insurance to promulgate regulations necessary to carry out the statute's provisions (§ 38–48–160).

Linder. Mrs. Linder called ICC and met with respondent Gerald Moore.[2]

In that initial meeting with Moore, the Linders discussed the fact that the insurance company had rejected their claim for the full value of Mr. Linder's gun collection. According to Mrs. Linder, Moore advised them the guns should be covered under their policy. Moore indicated that he advised the Linders to read their insurance policy and that he and Mr. Linder read the policy together. Respondent Jeffrey Raines states in an affidavit that they "were successful in obtaining payment for Mr. Linder's guns which was originally and erroneously denied by the company."

The Linders entered into a contract with ICC and agreed to pay ICC 10% of the total amount adjusted or otherwise recovered. In addition, they executed a "Notice" to their insurance company which indicated that ICC had been hired for the preparation of their claim and that ICC should be contacted for "any further information and negotiations" concerning their claim. After executing the contract with ICC, the Linders released the lawyer they had retained a couple of weeks before contacting ICC.

ICC communicated directly with the insurance company's adjuster both orally and in writing, as well as with the insurance company's attorney. The majority of the communications reflect that the adjusters concentrated on cost-related issues, such as completing the contents inventory and the sworn statement of proof of loss, as well as discussions on the extent and amount of repairs. Indeed, Raines stated that ICC spent over 300 man hours preparing the detailed inventory of the damaged household contents. According to Raines, ICC was able to obtain an almost $12,000 increase in what the insurance company originally agreed to cover. The Linders approved the claim, but the insurance company delayed payment. Raines stated that he then recommended to Mrs. Linder that she get an attorney. When the attorney settled the claim, the Linders executed a release of all claims.

On a "fact sheet" given to Mrs. Linder by Moore, ICC describes itself as a "professional Loss Consulting Firm"

---

2. Respondents are ICC, Moore, and Jeffrey Raines. Raines is president of ICC, Moore is vice-president, and each owns 50% of ICC's stock.

which represents a client's "best interest" while handling a property damage claim. The fact sheet states that ICC will provide, *inter alia:* an assessment of property loss; a leading law firm to review the insurance policy (at ICC's expense); a complete inventory of damaged contents; engineers, architects, accountants, etc., if required (at ICC's expense); all required documentation to properly project and substantiate additional living expenses and/or business interruption; and assistance in the preparation with the timely filing of the sworn statement of proof of loss. ICC stated that its main goal is to provide the client with an initial comprehensive study of the loss and damages. Finally, the following was printed at the bottom of the fact sheet:

REMEMBER, your insurance company has already appointed a professional to protect THEIR interest. ICC WILL PROTECT YOURS!

ICC states it no longer utilizes this exact fact sheet and has not used it for years, although it is not disputed that it was given to the Linders in 1996.[3]

The Linders also presented an envelope showing an ICC logo—a large "I" with two smaller "C"s underneath; the logo represents scales, and the Linders suggest that it is supposed to be the scales of justice. Respondents allege that the logo was designed to suggest an appropriate balancing between the insured and the insurance company.

The Linders did not pay ICC the 10% fee, as they had agreed in the contract. ICC brought suit against the Linders for the recovery of this contingency fee. The Linders answered the complaint, asserting, *inter alia,* that respondents engaged in the unauthorized practice of law and therefore the contract between them is void *ab initio.* In an amended answer, the Linders added counterclaims for negligence and breach of contract. The Linders then also attempted to assert a claim for unfair trade practices and sought to have a class certified to get relief for respondents' alleged unauthorized practice of law. At that point, the circuit court denied the

---

3. According to Raines, the fact sheet and the notice improperly state that ICC will associate with an attorney, if necessary. Raines explained that Florida allows such associations of adjusters and attorneys, but South Carolina does not; therefore, on advice of South Carolina counsel, ICC has stopped using the language on these forms.

Linders' request to amend their answer and stayed the action to allow them to seek declaratory relief in the original jurisdiction of this Court.

In their "Complaint for Declaratory Judgment," the Linders allege that: (1) ICC "solicited and advertised itself as a corporation providing services that are recognized as being the practice of law;" (2) Moore engaged in the unauthorized practice of law by advising the Linders regarding the language and interpretation of their policy; and (3) Raines engaged in the unauthorized practice of law by negotiating on behalf of the Linders. The Linders ask the Court to: (1) declare these practices the unauthorized practice of law; (2) declare the contract between the Linders and ICC void; and (3) "acknowledge a private right of action for matters declared by this Court to be the unauthorized practice of law."

## ISSUES

1. Does the business of public insurance adjusting constitute the unauthorized practice of law?

2. Did respondents engage in the unauthorized practice of law?

3. Is the contract between petitioner and ICC void as a matter of public policy?

4. Is there a private right of action for the unauthorized practice of law?

## 1. Public Insurance Adjusting Does Not Constitute the Unauthorized Practice of Law

Under the South Carolina Constitution, this Court has the duty to regulate the practice of law in South Carolina. *See* S.C. Const. art. V, § 4; *In re Unauthorized Practice of Law Rules*, 309 S.C. 304, 422 S.E.2d 123 (1992); *see also* S.C.Code Ann. § 40–5–10 (1986) (the Supreme Court has inherent power with respect to regulating the practice of law). Our duty to regulate the legal profession is not for the purpose of creating a monopoly for lawyers, or for their economic protection; instead, it is to protect *the public* from the potentially severe economic and emotional consequences which may flow from the erroneous preparation of legal documents or the inaccu-

rate legal advice given by persons untrained in the law. *See State v. Buyers Service Co., Inc.*, 292 S.C. 426, 431, 357 S.E.2d 15, 18 (1987). Indeed, protection of the public is our "paramount concern" in these matters. *Id.* at 434, 357 S.E.2d at 19.

 The practice of law "is not confined to litigation, but extends to activities in other fields which entail specialized legal knowledge and ability. Often, the line between such activities and permissible business conduct by non-attorneys is unclear." *Id.* at 430, 357 S.E.2d at 17. Indeed, we have recognized "it is neither practicable nor wise" to attempt to formulate a comprehensive definition of what constitutes the practice of law. *Unauthorized Practice of Law Rules*, 309 S.C. at 305, 422 S.E.2d at 124. Because of this ambiguity, what is, and what is not, the unauthorized practice of law is best decided in the context of an actual case or controversy. *See id.* Moreover, it is this Court that has the final word on what constitutes the practice of law.

The issue of whether insurance adjusters engage in the unauthorized practice of law is a novel one in South Carolina, but has been entertained by many courts in other jurisdictions. *See generally* James McLoughlin, Annotation, *Activities of Insurance Adjusters as Unauthorized Practice of Law*, 29 A.L.R.4th 1156 (1984 & Supp.2000).

For example, in *Rhode Island Bar Ass'n v. Lesser*, 68 R.I. 14, 26 A.2d 6 (1942), a man doing business as "Rhode Island Fire Loss Appraisal Bureau," was found to have engaged in the unauthorized practice of law. The Rhode Island Supreme Court held that the adjuster's activities of negotiating and obtaining adjustments of claims for losses under fire insurance policies, which involved, "directly or indirectly, advice or counsel with reference to their claims and rights under the policies," and charging a contingency fee for his services, constituted the unauthorized practice of law. *Id.* at 8. The *Lesser* court found that these activities exceeded a mere "appraisal service." However, in affirming the injunction against the adjuster, the Court noted that the injunction decree expressly reserved to Lesser the right "to solicit from the general public the work of appraising damage caused by fire, making inventory of real and personal property so damaged, appraising the value of such property both prior to and immediately following

a fire, and submitting to the owners of the same a complete and itemized statement showing sound value and loss." *Id.* at 9. Thus, the *Lesser* court was primarily concerned with the adjuster's activities of: (1) advising clients on their claims and rights under the policy, (2) negotiating settlements for the claim, and (3) accepting a contingency fee.[4]

The Pennsylvania Supreme Court in *Dauphin County Bar Ass'n v. Mazzacaro,* 465 Pa. 545, 351 A.2d 229 (1976), declared that a "licensed casualty adjuster" who represented clients on their damage claims against tortfeasors or their insurers was correctly enjoined from handling these third-party claims. The court found that pursuant to Pennsylvania's Public Adjuster Act, only first-party adjusting was authorized. In handling third-party claims, Mazzacaro would investigate the accident, estimate the amount of damages sustained, write a demand letter and attempt to negotiate a settlement. He argued that his representation was permissible because his clients' claims were ones in which liability was presumed and the only issue was damages. The Pennsylvania Supreme Court rejected his argument, noting that it "ignore[d] the vital role that legal assessments play in the negotiation process between a victim of an injury and an alleged tortfeasor or insurer." *Id.* at 233. Significantly, the *Mazzacaro* court stated the following:

> While the objective valuation of damages may in uncomplicated cases be accomplished by a skilled lay judgment, an assessment of the extent to which that valuation should be compromised in settlement negotiations cannot. Even when liability is not technically 'contested,' an assessment of the likelihood that liability can be established in a court of law is a crucial factor in weighing the strength of one's bargaining position. A negotiator cannot possibly know how large a settlement he can exact unless he can probe the degree of

---

4. Respondents argue *Lesser* is no longer binding in Rhode Island because statutes were subsequently enacted regulating public adjusting. R.I. Gen. Laws § 27–10–1 *et seq.* (1998); *see also* R.I. Gen. Laws § 11–27–9 (2000) (where, as part of Rhode Island's statutory chapter regulating the practice of law, there are specifically restrictions on the practices of public adjusters, including a prohibition on advising a claimant on his legal rights). We need not decide whether *Lesser* remains good law in Rhode Island; we review other jurisdictions' decisions simply for guidance on this issue.

unwillingness of the other side to go to court. Such an assessment, however, involves an understanding of the applicable tort principles ..., a grasp of the rules of evidence, and an ability to evaluate the strengths and weaknesses of the client's case vis a vis that of the adversary. The acquisition of such knowledge is not within the ability of lay persons but rather involves the application of abstract legal principles to the concrete facts of the given claim. As a consequence, it is inescapable that lay adjusters who undertake to negotiate settlements of the claims of third-party claimants must exercise legal judgment in so doing.

*Id.* at 233–34.

Although the *Mazzacaro* case clearly applied only to third-party adjusting, the above language was specifically cited in a 1977 South Carolina Attorney General opinion. 1977 Op. S.C. Att'y Gen. 308 (1977). In this opinion, the Attorney General addressed a question from a representative about a proposed bill regulating public adjusters. The adjuster's "appraisal activities" were not at issue; only the adjuster's "advice to the insured and negotiations with the insurance company" were the subject of the inquiry. The Attorney General found that the analysis of *Mazzacaro* applied not only to third-party adjusting, but to public adjusters handling first-party claims as well. Therefore, it was the opinion of the Attorney General that all public adjusters would engage in the unauthorized practice of law and that any legislation which permitted public adjusting would be unconstitutional.

The Texas Court of Appeals has spoken twice on whether public adjusters engage in the unauthorized practice of law. In *Brown v. Unauthorized Practice of Law Committee*, 742 S.W.2d 34 (Tex.App.1987), *writ denied* (Jan. 27, 1988), the court found the actions of Brown, who apparently handled both first-party and third-party claims, were clearly the unauthorized practice of law. Brown had accepted settlement checks as "Ron Brown, Attorney at Law." The court found he advised clients as to their rights and the advisability of making claims and approved settlements. Furthermore, the court found Brown's course of conduct encouraged litigation. As to Brown's assertion that he handled only "uncontested" claims, the court stated that "because the evidence shows that Brown negotiated, at least on damage issues, we cannot agree that

Brown handled only undisputed and uncontested cases." *Id.* at 40. The court held that such negotiation requires "the use of legal skill and knowledge and, thus, constituted the practice of law." *Id.* at 42.

In 1991, the Texas Court of Appeals decided *Unauthorized Practice of Law Committee v. Jansen,* 816 S.W.2d 813 (Tex. App.1991), *writ denied* (Jan. 8, 1992). Jansen was a first-party public adjuster. At the trial level, the trial court found various activities by Jansen constituted the unauthorized practice of law, and enjoined him from, *inter alia:* (1) advising clients on whether to accept an offer from an insurance company, and (2) advising clients of their rights, duties, or privileges under an insurance policy. Jansen did not appeal. The trial court specifically found the following practices did *not* constitute the unauthorized practice of law:

- A. Advising clients to seek the services of a licensed attorney if they have questions relating to their legal rights, duties and privileges under policies of insurance;
- B. Measuring and documenting first party claims under property insurance policies and presenting them to insurance companies on behalf of clients;
- C. Discussing the measurement and documentation presented to the insurance company with representatives of insurance companies;
- D. Advising clients that valuations placed on first party property insurance claims by insurance companies is or is not accurate[.]

*Id.* at 814.

The Unauthorized Practice of Law Committee (UPLC) appealed these findings and argued that the measure and documentation of first-party claims, the presentation of these claims to insurance companies, and the discussion of the claims with insurance company adjusters all constitute the unauthorized practice of law. The *Jansen* court disagreed:

We cannot agree with UPLC's contention that providing an estimate of property damage and filling out the appropriate forms to present a claim constitutes the practice of law. In reality, this is the same procedure any insured is required to follow to collect on an insurance policy. The fact that appellee is paid for his services and expertise does not

convert his actions into the practice of law. Our holding is not to be construed as authorizing discussions or "negotiations" with insurance companies into coverage matters. Nor do we mean to imply that "presenting" a claim to the insurance company by a public insurance adjuster is the same as negotiating a settlement. The former is, in essence, merely delivering necessary paperwork and data while the latter entails the practice of law. Interpretation of insurance contracts would also most likely cross the line into the practice of law. Appellee agrees that if the issue to be submitted to an insurance company involves a coverage dispute, then the services of an attorney are required. We find that the trial court arrived at a suitable accommodation that will not totally eliminate the profession of public insurance adjusting in the State.

*Id.* at 816.

The *Jansen* court then distinguished its earlier decision in *Brown*, and held that a public adjuster may have discussions with an insurance company adjuster about competing property-damage valuations, provided that liability under the policy is uncontested. The court found Brown's activities regarding personal injury claims were sufficiently different from Jansen's activities: "An opinion concerning the valuation, whether it be repair cost or replacement cost, of a damaged piece of property hardly equates to counseling a client to settle a claim." *Id.*

The *Jansen* case therefore represents a somewhat different viewpoint on what is allowable for first-party public adjusters. Although interpreting policies and getting involved in coverage disputes remained a concern for the *Jansen* court, it was not willing to rule that negotiating on *valuations* of property damage in uncontested cases constitutes the unauthorized practice of law.

■ In our opinion, the business of public insurance adjusting does not *per se* constitute the practice of law. We note the parties agree that public adjusters may act as appraisers. Since a public adjuster may use his expertise to determine a value, we simply do not see why it would be beyond his expertise to discuss that value, and the insurer's competing value, with the client and the insurer's adjuster. This type of

negotiation activity—as long as it is limited to valuations of property and repairs—does not require legal skill and knowledge. *Accord Jansen,* 816 S.W.2d at 816 ("An opinion concerning the valuation, whether it be repair cost or replacement cost, of a damaged piece of property hardly equates to counseling a client to settle a claim.").

Nonetheless, because the activities of public insurance adjusters may bring them close to the line between permissible business conduct by non-attorneys and the unauthorized practice of law, we must clarify what is and is not appropriate conduct by public adjusters. After analyzing the decisions in other jurisdictions, we are most persuaded by the reasoning expressed by the Texas court in the *Jansen* case.[5] Like the *Jansen* court, we feel that a suitable accommodation may be made to preserve the business of public adjusting, yet protect the public from the dangers of the unauthorized practice of law.

Specifically, we find there is no problem with a public adjuster measuring and documenting insurance claims, and then presenting those valuations to the insurance company. *See id.* at 816 (providing an estimate of property damage and filling out the appropriate forms to present a claim does not constitute the practice of law because this is what an insured is required to do to collect on an insurance policy). Therefore, we declare the following practices permissible:

A. Providing an estimate of property damage and repair costs, i.e., any purely appraisal-oriented activities by the public adjuster.

---

5. We reject the conclusion of the 1977 Attorney General opinion, based on the logic of the *Mazzacaro* court, that legal analysis necessarily is required in *any* negotiations with the insured. *Mazzacaro* involved third party adjusters and the settlement of tort actions, and we find that first party claims are sufficiently distinguishable from third party claims. Furthermore, South Carolina law has not authorized third-party public adjusting; only first-party public adjusting is permitted. *See* § 38–48–10 (defining public adjusting as the handling of first-party claims).

In addition, we do not share the concern indicated by the *Lesser* court that charging a contingency fee is a primary consideration on this issue. A contingency fee arrangement, in and of itself, is not the practice of law.

B. Preparing the contents inventory and/or sworn statements on proof of loss.

C. Presenting the claim to the insurance company, i.e., delivering the necessary paperwork and data to the insurer.

D. Negotiating with the insurance company, as long as the discussions only involve competing property-damage valuations.

As to what activities are prohibited, we declare that public adjusters shall not:

A. Advise clients of their rights, duties, or privileges under an insurance policy regarding matters requiring legal skill or knowledge, i.e., interpret the policy for clients.

B. Advise clients on whether to accept a settlement offer from an insurance company.

C. Become involved, in any way, with a coverage dispute between the client and the insurance company.

D. Utilize advertising that would lead clients to believe that public adjusters provide services which require legal skill.

We believe that these guidelines are consistent with South Carolina's recently enacted statute regulating the business of public adjusting. *See, e.g.,* § 38–48–70(h) (a public adjuster shall not "offer or provide advice as to whether the insured's claim is covered by the insured's contract with the insurer."); § 38–48–100 ("All advertising by a public adjuster shall fairly and accurately describe the services to be rendered and shall not misrepresent either the public adjuster or the public adjuster's abilities . . . ."). Although we reiterate that it is the duty of this Court, and not the Legislature, to delineate the practice of law, we note that the statutory scheme regulating public adjusting specifically addresses many of the concerns that are implicated by the issue before the Court today, and, in our opinion, deals with those concerns appropriately.

In sum, the business of public adjusting does not, in and of itself, embody the practice of law. We are confident

that the parameters set out above will inform public adjusters of the limits of their occupation.[6]

## 2. By Some of Their Actions, Respondents Engaged in the Unauthorized Practice of Law.

The question remains whether respondents engaged in the unauthorized practice of law. Although they certainly did not have the benefit of the guidelines we announce today, we nevertheless must decide whether respondents crossed the line into the unauthorized practice of law. Because they advised the Linders on their rights under the insurance policy and became involved with a known coverage dispute, we conclude that they did.

We find from the record before us that respondents advised the Linders on the extent of coverage for Mr. Linder's gun collection, and then subsequently discussed this with the insurance adjuster. While this "advice" may simply have been

---

**6.** The dissenting opinion would allow public adjusters to interpret insurance contracts, negotiate coverage disputes, and advise their clients whether to accept settlement offers. Clearly, these activities require legal training and therefore constitute the practice of law. *See State v. Buyers Service Co., Inc.*, 292 S.C. at 430, 357 S.E.2d at 17 (activities which entail specialized legal knowledge and ability are the practice of law). Simply because public adjusters have expertise in adjusting, i.e., valuating property insurance claims, does not mean they have legal expertise in interpreting insurance policies and negotiating coverage disputes.

Indeed, respondents themselves concede in their brief that disputed matters involving coverage are matters outside the scope of the public adjuster's expertise. Furthermore, section 38–48–40(h) quite plainly states that a public adjuster shall "not offer or provide advice as to whether the insured's claim is covered by the insured's contract with the insurer." While the dissent interprets § 38–48–40(h) "merely to prohibit public adjusters from making any promise of guarantee of recovery to their clients," the plain language of this subsection does not support such an interpretation.

Nor does § 38–48–130(b). Section 38–48–130(b) states that it is unlawful for a person to "adjust or aid in the adjustment, either directly or indirectly, of a claim arising under a contract of insurance not authorized by the laws of this State." The dissent cites this section to support its conclusion that a public adjuster "is required to determine the legality of a contract before undertaking to adjust a loss under it." We find no such requirement implied in § 38–48–130(b). Moreover, a determination of "the legality of a contract" is, without a doubt, an activity requiring specialized legal knowledge, and one that only should be undertaken by lawyers and judges.

pointing out the policy language to the Linders, it still constituted counsel on the Linders' rights under the policy. Moreover, Moore knew at the time that the insurer had limited liability on the gun collection based on its interpretation of the policy. It matters not that the insurance company was mistaken. This clearly was a coverage dispute between the Linders and their insurer, and therefore, respondents should not have become involved. Their involvement went beyond an evaluation on the vital question of "how much" the gun collection was worth, and transgressed into an evaluation of whether, and to what extent, the guns should be covered pursuant to the policy language.

 The acts of (1) interpreting and advising the clients on the insurance policy, and (2) negotiating with the insurer *on coverage disputes,* require legal knowledge and skill, and therefore are not permitted without a law license. *See State v. Buyers Service Co., Inc.,* 292 S.C. at 430, 357 S.E.2d at 17 (activities which entail specialized legal knowledge and ability are the practice of law). We find that respondents stepped over the line and that these acts constituted the unauthorized practice of law.[7]

### 3. The contract between petitioner and ICC is not void.

 The Linders argue that the contract between them and ICC is against the public policy of South Carolina and the Court should declare it void. Given our holding above that the business of public adjusting does not inherently constitute the unauthorized practice of law, we find the contract is not void *as a matter of law.* The Linders, however, also argue that the contract, *as performed,* amounted to the practice of law and thus should not be enforced.

---

7. As to the Linders' allegation that ICC's logo was impermissible in some way because it represented the "scales of justice," we disagree. Simply by using a logo that represented scales does not automatically indicate that ICC was advertising itself as a provider of legal services. Surely, the legal profession does not claim to have a monopoly on the graphical use of scales in advertising. We also find that in the context of its other printed materials, including the Fact Sheet, ICC's use of the scales logo would not lead to a reasonable conclusion that ICC's employees, as public adjusters, were providing legal services.

■ This Court has the duty to regulate the practice of law in South Carolina. *See* S.C. Const. art. V, § 4; *In re Unauthorized Practice of Law Rules, supra.* We have found that respondents did commit some acts that amounted to the unauthorized practice of law. We note, however, that the majority of respondents' work appears to have *not* entailed the unauthorized practice of law. We therefore hold that the most appropriate manner in which to sanction respondents for their transgressions is for the trial court, in the underlying action, to determine the value of respondents' work which did not constitute the unauthorized practice of law. Respondents are entitled to that amount, but are not to be compensated for any amount attributable to their unauthorized activities.

## 4. There is no private right of action for the unauthorized practice of law.

■ Finally, the Linders maintain that once an act is declared to be the unauthorized practice of law, then the circuit court has jurisdiction to hear various causes of action, including a tort action for damages. Respondents, on the other hand, argue that there is no private right of action for the unauthorized practice of law. We agree with respondents.

In bringing the instant action, the Linders acted in accordance with this Court's decision in *Unauthorized Practice of Law Rules*, where we urged "any interested individual who becomes aware of such conduct [which may be the unauthorized practice of law] to bring a declaratory judgment action in this Court's original jurisdiction to determine the validity of the conduct." *Unauthorized Practice of Law Rules*, 309 S.C. at 307, 422 S.E.2d at 125. We did not, however, authorize a private right of action. Furthermore, there are statutes which prevent the unauthorized practice of law, and while they state such activity will be deemed a crime, they do not sanction a private cause of action. S.C.Code Ann. §§ 40–5–310 and –320 (2001).

When faced with a similar issue, the Supreme Court of Hawaii found that its criminal statutes prohibiting the unauthorized practice of law, while providing remedies such as declaratory and injunctive relief, as well as criminal sanctions, did not create a private claim for damages. *Reliable Collec-*

*tion Agency, Ltd. v. Cole*, 59 Haw. 503, 584 P.2d 107 (1978). We adopt that reasoning and hold there is no private right of action in South Carolina for the unauthorized practice of law.

## CONCLUSION

In sum, we declare that the business activities of first-party public adjusters do not constitute the practice of law, subject to the restrictions outlined in this opinion. However, because respondents did engage in acts which we now have announced are prohibited, we direct the circuit court in the underlying action to determine the value of respondents' authorized work. Finally, we hold there is no private right of action for the unauthorized practice of law.

**JUDGMENT DECLARED.**

MOORE and BURNETT, JJ., concur. PLEICONES, J., dissenting in part in a separate opinion in which TOAL, C.J., concurs.

Justice PLEICONES.

I agree with the majority that the contract between the Linders and ICC is not void, and that there is no private cause of action for the unauthorized practice of law. Unlike the majority, however, I would permit licensed public adjusters to interpret insurance contracts to the extent necessary to adjust their clients claim,[8] to negotiate coverage disputes, and to

---

8. I am aware of S.C.Code Ann. § 38–48–70(h) (Supp.2000) which provides that "A public insurance adjuster shall not offer or provide advice whether the insured's claim is covered by the insured's contract with the insurer." I find it difficult to reconcile this prohibition with the definition of public adjusting in § 38–48–10(2) (Supp.2000) which states, " 'Public adjusting' means investigating, appraising or evaluating, and reporting to an insured in relation to a first party claim . . . ," and with the statutory provision that makes it a felony for an adjuster to "adjust or aid in the adjustment, either directly or indirectly, of a claim arising under a contract of insurance not authorized under the laws of this State. . . ." S.C.Code Ann. § 38–48–130(b) (Supp.2000). The public adjuster is required to determine the legality of a contract before undertaking to adjust a loss under it, § 38–48–130(b), and to investigate, evaluate, and report to his client regarding the client's claim, § 38–48–10(2), but is forbidden to advise whether the insured's claim is covered. I would read § 38–48–70(h) merely to prohibit public adjusters from making any promise or guarantee of recovery to their clients.

advise their clients whether to accept settlement offers.[9] Public adjusters are hired for their expertise in the handling of insurance claims, and I would permit them to use their specialized knowledge in aid of their clients' claims. *Compare In re The Unauthorized Practice of Law Rules*, 309 S.C. 304, 422 S.E.2d 123 (1992)(CPAs do not engage in the unauthorized practice of law when practicing in their area of expertise.)

For example, the majority concludes that ICC engaged in the unauthorized practice of law when it assisted the Linders in recovering the full value of their gun collection. I would not deny the Linders the benefit of the very expertise which led them to hire ICC in the first place, nor would I require ICC to remain silent when it perceived a coverage issue not apparent to the client. I would, however, require the public adjuster to refrain from advising the client at the point where the insurance company involves an attorney in the matter or when the legal process is invoked.

For the reasons given above, I join parts 3 and 4 of the majority opinion, but dissent in part from parts 1 and 2. I would find that ICC did not engage in the unauthorized practice of law.

TOAL, C.J., concurs.

---

**9.** As the majority acknowledges, an adjuster is one who determines or settles an insurance claim. *Black's Law Dictionary* 27 (6th ed.1991). Further, our statute authorizes a public adjuster to investigate, appraise, evaluate a claim, and report to his insured. S.C.Code Ann. § 38–48–10(2) (Supp.2000). In my opinion, an adjuster must be able to construe the contract and advise on settlements in order to met the statutory definition of her role. To require her to abstain, however, should a coverage dispute arise is to undermine her ability to "determine or settle" a claim.