803 S.E.2d 707

Vance L. BOONE, Thelma Boone, Travis G. Messex, Theresa S. Messex, Brian Johnson, and Kelli Johnson, on behalf of themselves and all others similarly situated, Petitioners,

v.

QUICKEN LOANS, INC. and Title Source, Inc., Respondents.

Appellate Case No. 2013-002288

Opinion No. 27727

Supreme Court of South Carolina.

Heard October 19, 2016

Filed July 19, 2017

Rehearing Denied September 13, 2017

Charles L. Dibble, of Dibble Law Offices, of Columbia, Steven W. Hamm, of Richardson Plowden & Robinson, P.A., of Columbia; C. Bradley Hutto, of Williams & Williams, of Orangeburg and Daniel Webster Williams, of Bedingfield & Williams, of Barnwell, for Petitioners/Respondents.

Benjamin Rush Smith, III, Allen Mattison Bogan, and Carmen Harper Thomas, all of Nelson Mullins Riley & Scarborough LLP, of Columbia, and Jeffrey B. Morganroth, of Morganroth & Morganroth, PLLC, of Birmingham, MI, pro hac vice, for Respondents/Petitioners.

JUSTICE KITTREDGE:

We accepted this declaratory judgment matter in our original jurisdiction to determine if Respondents/Petitioners Quicken Loans, Inc. (Quicken Loans) and Title Source, Inc. (Title Source) have engaged in the unauthorized practice of law (UPL).[1] In their complaint, Petitioners/Respondents Vance L. and Thelma Boone, Travis G. and Theresa S. Messex, and Brian and Kelli Johnson (collectively "Homeowners"), alleged the residential mortgage refinancing model implemented by Quicken Loans and Title Source in refinancing the Homeowners' mortgage loans constitutes UPL. In addition to seeking declaratory relief, Homeowners' complaint also sought class certification and requested class relief.[2]

We referred this matter to a Special Referee to take evidence and issue a report containing proposed findings of fact and recommendations to the Court regarding the UPL issue, as well as on the issues of class certification and class relief. Following an evidentiary proceeding during which the parties submitted extensive testimony and documentary evidence, the Special Referee issued a report proposing various factual findings and recommending this Court declare that Quicken Loans and Title Source engaged in UPL but opining that neither class certification nor class relief were appropriate under the circumstances. Quicken Loans and Title Source took exception to the Special Referee's proposed findings of fact and UPL recommendation. Homeowners took exception to Special Referee's recommendation that class certification and class relief were unwarranted under the circumstances.

We find the record in this case shows licensed South Carolina attorneys were involved at every critical step of these refinancing transactions, as required by our precedents. We also find that requiring more attorney involvement would not

---

1. *In re Unauthorized Practice of Law Rules Proposed by the South Carolina Bar*, 309 S.C. 304, 422 S.E.2d 123 (1992).

2. Specifically, Homeowners requested that certain class members' mortgage liens filed after August 8, 2011, (the date this Court refiled its decision in *Matrix Financial Services Corp. v. Frazer*, 394 S.C. 134, 714 S.E.2d 532 (2011)), be declared void and that Quicken and Title Source be required to disgorge all fees collected during the refinancing process, together with prejudgment interest.

effectively further our stated goal of protecting the public from the dangers of UPL. We therefore respectfully reject the Special Referee's conclusion that Quicken Loans and Title Source committed UPL. Because we reject the finding of UPL, we need not address the parties' remaining exceptions, including Homeowners' request that we declare their mortgages void and certify this case as a class action.

## I.

Quicken Loans is a nationwide online mortgage lender that provides, among other things, residential mortgage loan refinances. Prior to expanding into the South Carolina market, Quicken Loans engaged South Carolina attorneys—with expertise in real estate transactions and knowledgeable of our UPL jurisprudence—to review the Quicken Loans refinance procedure. After reviewing the procedure, the attorneys opined that the procedure would not constitute UPL, as evidenced by the sufficient involvement of a South Carolina lawyer at each critical step. Buoyed by the supporting opinions of South Carolina lawyers, Quicken Loans moved forward with offering residential mortgage loan refinance services to South Carolina borrowers.

Under the Quicken Loans refinance procedure, the borrowers have already purchased the property and are simply seeking a new mortgage loan (presumably with more favorable terms) to replace the existing loan. The process begins with a potential borrower completing a loan application, which is typically done online. Thereafter, the borrower speaks on the telephone with a licensed mortgage banker employed by Quicken Loans. Each borrower is informed that he or she has the right to select legal counsel to represent him or her in the transaction and asked whether he or she has a preference as to a specific attorney.[3] If the borrower does not desire to use a particular attorney during the loan transaction, Quicken Loans engages Title Source, a nationwide provider of settlement services and title insurance, to provide the necessary settlement services. Title Source, in turn, subcontracts with various

---

**3.** *See* S.C. Code Ann. § 37-10-102 (2015) (requiring mortgage lenders to ascertain a borrower's preference as to the legal counsel they wish to employ to represent them in connection with closing the loan transaction).

individuals and entities (including licensed South Carolina attorneys) to perform those various services in compliance with South Carolina law.

For the transactions at issue in this case, Title Source turned to a non-attorney abstractor (Abstractor) to perform a title search and prepare a title abstract. In each of these transactions, Title Source initiated the title search by ordering a title abstract from Abstractor via email for each particular parcel of property to be refinanced. The scope of each title search was directed by Title Source in the email ordering the search; for loan refinances, no transfer of ownership takes place, so the title search includes two years back from the relevant vesting deed. Upon receiving a title abstract order from Title Source, Abstractor determined the county in which the property is located, then traveled to the relevant county land records office to locate and photocopy the pertinent documents on record, such as deeds, mortgages, mortgage assignments, loan modifications, tax documents, and personal judgments against the borrower(s). Thereafter, Abstractor prepared an "abstract" or index of the documents pulled from the public records, scanned and uploaded the abstract sheet along with the documents themselves, and electronically transmitted both the abstract and supporting documents back to Title Source through a web portal.[4]

After Abstractor's reports were transmitted to Title Source through the web portal, Title Source subsequently digitally transmitted those reports to David Aylor, a South Carolina attorney, who personally reviewed the title abstract and accompanying documents. If appropriate, based on his review of the documents, Aylor used an electronic template to generate and digitally sign title review certificates, verifying that he had reviewed the title documents and that the property owners held fee simple title to the property they were seeking to refinance.[5] Following receipt of the title certification, Title

---

4. Abstractor testified that occasionally, she would receive follow-up inquiries seeking clarification or requests for additional documents, and in those cases, she would revisit the county courthouse to clarify or to obtain the requested document(s) and upload those through the Title Source web portal.

5. Aylor testified that in reviewing the documents in title abstracts, he would sometimes encounter a problem which required him to contact

Source produced a title commitment, which it submitted to Quicken Loans.

Thereafter, Title Source and Quicken Loans coordinated to schedule the loan closings and prepare the closing package, including the HUD-1 settlement statement, note, mortgage, and closing instructions, which were reviewed by the closing attorney prior to closing. In reviewing the closing package documents, the closing attorney confirmed that the title work was certified by a South Carolina lawyer and that the closing documents were accurate and complied with the law, and if necessary, made corrections or refused to proceed with the closing until the discrepancies were resolved.

Thereafter, the closing attorneys met with the borrowers in person, explained the legal effect of the loan documents, answered any questions the borrowers had, and supervised the borrowers' execution of the legal instruments.

Once the closing was finished, the attorney returned the executed documents to Title Source, along with detailed instructions on recording certain documents and disbursing loan proceeds. Upon the disbursement of funds, Title Source provided each closing attorney with a closing ledger, which the closing attorney used to confirm that disbursement of the funds was done in accordance with the HUD-1 settlement statement. Following recordation in the proper county land records office, a certified copy of each recorded document is mailed to the closing lawyer for their review.

---

the abstractor with follow-up questions and occasionally, when the issue could not be resolved quickly, required him to notify Title Source that there would be a delay in issuing the title certificate. Aylor explained that sometimes the issue was as simple as poor copy quality of a particular document, but other times, it was "more serious than that." Aylor understood as the South Carolina attorney rendering an opinion as to the title of the property, he was responsible for reviewing the abstractor's report and vouching for its legal sufficiency. *See Ex parte Watson*, 356 S.C. 432, 436, 589 S.E.2d 760, 762 (2003) ("[W]e hold that when nonlawyer title abstractors examine public records and then render an opinion as to the content of those records, they are engaged in the unauthorized practice of law. But if a licensed attorney reviews the title abstractor's report and vouches for its legal sufficiency by signing the report, title abstractors would not be engaged in the unauthorized practice of law.").

Notably, each of the attorneys involved throughout these challenged transactions testified that they maintained their independence and were not controlled by Quicken Loans or Title Source in the exercise of their professional judgments. Moreover, at the hearing before the Special Referee, William Higgins, an expert in ethical and professional responsibility issues associated with real estate transactions in South Carolina, opined that Quicken Loans and Title Source had developed an "efficient, automated, consumer-friendly method" and "they've done so in a way that includes direct and appropriate involvement of South Carolina licensed lawyers, and they've done it in a way that [ ] allows those lawyers to act independently that does not impinge on their professional responsibilities or their professional independence."

Nevertheless, at the conclusion of the evidentiary hearing, the Special Referee issued a report recommending this Court declare Respondents' conduct to be UPL and issue an injunction against Respondents conducting real estate refinance transactions in South Carolina. In so finding, the Special Referee focused on the proper issue, that is, whether the supervision by the South Carolina attorneys was sufficient and "meaningful."

Quicken Loans and Title Source take exception to the Special Referee's recommendation that the Court find they engaged in UPL and contend the Report and Recommendation misconstrued this Court's UPL precedents and omitted and ignored material facts demonstrating Respondents' compliance with the law and protection of South Carolina consumers. Conversely, the Homeowners urge this Court to adopt the Special Referee's finding that Quicken Loans and Title Source engaged in UPL; the Homeowners further contend they are also entitled to additional relief beyond the injunction recommended by the Special Referee.

## II.

The South Carolina Constitution assigns to this Court the duty to regulate the practice of law. S.C. Const. art. V, § 4. "South Carolina, like other jurisdictions, limits the practice of law to licensed attorneys." *Brown v. Coe*, 365 S.C. 137, 139, 616 S.E.2d 705, 706 (2005) (citation omitted). "[T]he policy

of prohibiting laymen from practicing law is not for the purpose of creating a monopoly in the legal profession, nor for its protection, but to assure *the public* adequate protection in the pursuit of justice, by preventing the intrusion of incompetent and unlearned persons in the practice of law." *State ex rel. Daniel v. Wells*, 191 S.C. 468, 5 S.E.2d 181, 186 (1939) (emphasis added).

"The generally understood definition of the practice of law embraces the preparation of pleadings, and other papers incident to actions and special proceedings, and the management of such actions and proceedings on behalf of clients before judges and courts." *Crawford v. Cent. Mortg. Co.*, 404 S.C. 39, 45, 744 S.E.2d 538, 541 (2013) (quoting *State v. Despain*, 319 S.C. 317, 319, 460 S.E.2d 576, 577 (1995)) (internal quotation marks omitted). Further, this Court has recognized that "[t]he practice of law is not confined to litigation, but extends to activities in other fields which entail specialized legal knowledge and ability." *State v. Buyers Serv. Co.*, 292 S.C. 426, 430, 357 S.E.2d 15, 17 (1987). This includes the preparation of legal documents "when such preparation involves the giving of advice, consultation, explanation, or recommendations on matters of law." *Franklin v. Chavis*, 371 S.C. 527, 531–32, 640 S.E.2d 873, 876 (2007).

However, "[o]ther than these general statements, there is no comprehensive definition of the practice of law." *Roberts v. LaConey*, 375 S.C. 97, 103, 650 S.E.2d 474, 477 (2007) (citing *Linder v. Insurance Claims Consultants, Inc.*, 348 S.C. 477, 487, 560 S.E.2d 612, 617–18 (2002)).

The absence of a precise definition is deliberate. This Court has resisted attempts to establish a bright-line definition of what constitutes the practice of law, [6] explaining "what constitutes the practice of law must be decided on the facts and in

---

6. Likewise, other states have also eschewed a rigid definition of what constitutes the practice of law in favor of a case-by-case approach. As the Massachusetts Supreme Judicial Court has explained:

We believe it is impossible to frame any comprehensive and satisfactory definition of what constitutes the practice of law. To a large extent each case must be decided upon its own particular facts. But at least it may be said that in general the practice of directing and managing the enforcement of legal claims and the establishment of the legal rights of others, where it is necessary to form and to act upon opinions as to what those rights are and as to the legal methods

the context of each individual case." *Id.* Indeed, in 1992, we declined to adopt a set of rules proposed by the South Carolina Bar which were designed to define and delineate those activities which constitute the practice of law because we determined "it is neither practicable nor wise to attempt a comprehensive definition by way of a set of rules." *In re Unauthorized Practice of Law Rules*, 309 S.C. 304, 305–07, 422 S.E.2d 123, 124–25 (1992). Instead, we determined "the better course is to decide what is and what is not the unauthorized practice of law in the context of an actual case or controversy" rather than through an abstract set of guidelines. *Id.* However, in making our determination, we also urged "any interested individual who becomes aware of conduct" that might constitute UPL "to bring a declaratory judgment action in this Court's original jurisdiction to determine the validity of the conduct." *Id.* at 307, 422 S.E.2d at 125. And it is pursuant to that directive that Homeowners filed this action asking the Court to examine the residential mortgage-refinance business model implemented by Quicken Loans and Title Source.

During the last three decades, this Court has explored many times what activities constitute the practice of law in the context of a residential real estate transaction. Almost thirty years ago, in the seminal case of *Buyers Service*, we first identified four steps in a residential real estate purchase transaction that constitute the practice of law and, therefore, must be performed or supervised by a South Carolina-licensed attorney: (1) the preparation of "deeds, notes[,] and other instruments related to mortgage loans and transfers of real property";[7] (2) title examination and the "preparation of title abstracts for persons other than attorneys";[8] (3) overseeing

---

which must be adopted to enforce them, the practice of giving or furnishing legal advice as to such rights and methods and the practice, as an occupation, of drafting documents by which such rights are created, modified, surrendered[,] or secured are all aspects of the practice of law.

*In re Shoe Mfrs. Protective Ass'n*, 295 Mass. 369, 3 N.E.2d 746, 748 (1936) (reaffirmed by *Real Estate Bar Ass'n for Massachusetts, Inc. v. Nat'l Real Estate Info. Servs.*, 459 Mass. 512, 517–18, 946 N.E.2d 665, 674 (2011)).

7. *Buyers Serv.*, 292 S.C. at 430, 357 S.E.2d at 17.

8. *Id.* at 432, 357 S.E.2d at 18.

"real estate and mortgage loan closings" and "instructing clients in the manner in which to execute legal documents";[9] (4) and giving "instructions to the Clerk of Court or Register of Mesne Conveyances as to the manner of recording" documents.[10] *Buyers Serv.*, 292 S.C. at 430–34, 357 S.E.2d at 17–19 (citations omitted). Thereafter, we recognized a fifth step that must be supervised by an attorney—the disbursement of funds. *Doe Law Firm v. Richardson*, 371 S.C. 14, 18, 636 S.E.2d 866, 868 (2006). Although we acknowledged that the "disbursement of loan proceeds [does not] in and of itself 'entail[ ] specialized legal knowledge and ability' such that it constitutes the practice of law," we nevertheless explained that "disbursement of funds in the context of a residential real estate loan closing cannot and should not be separated from the process as a whole." *Id.* (quoting *Buyers Serv.*, 292 S.C. at 430, 357 S.E.2d at 17)).

The common thread running through our decisions is the desire to protect the public. We determined that UPL claims should be analyzed on a case-by-case basis "to strike a proper balance between the legal profession and other professionals which will ensure the public's protection from the harms caused by the unauthorized practice of law." *In re Unauthorized Practice of Law Rules*, 309 S.C. at 307, 422 S.E.2d at 125. As the Supreme Court of Georgia has observed regarding that state's similar requirement that an attorney oversee real estate transactions, "[i]f the attorney fails in his or her responsibility in the closing, the attorney may be held accountable through a malpractice or [ ] disciplinary action. In contrast, the public has little or no recourse if a non-lawyer fails to close the transaction properly." *In re UPL Advisory Opinion 2003–2*, 277 Ga. 472, 588 S.E.2d 741, 742 (2003).

---

9. *Id.* at 433, 357 S.E.2d at 19.

10. *Id.* at 434, 357 S.E.2d at 19. Specifically, as to the fourth step, we explained,

   We do not consider the physical transportation or mailing of documents to the courthouse to be the practice of law. However, when this step takes place as part of a real estate transfer, it falls under the definition of the practice of law as formulated by this court ... It is an aspect of conveyancing and affects legal rights. The appropriate sequence of recording is critical in order to protect a purchaser's title to property.

   *Id.*

Indeed, the goal of consumer protection was at the heart of this Court's reasoning in *Buyers Service*, no more so than when the Court stated, "The reason preparation of instruments by lay persons must be held to constitute the unauthorized practice of law is ... for the protection of the public from the potentially severe economic and emotional consequences which may flow from erroneous advice given by persons untrained in the law." 292 S.C. at 431, 357 S.E.2d at 18.[11] We further observed that requiring the closing to be performed by a licensed attorney would help ensure the involvement of at least one professional "possessed of the requisite skill, competence and ethics," and would provide true accountability by allowing meaningful recourse to members of the public. *Id.*

Indeed, the complete lack of attorney involvement was what prompted this Court to find UPL had occurred in *Buyers Service* and in *Matrix Financial Services Corp. v. Frazer*, 394 S.C. 134, 714 S.E.2d 532 (2011). Buyers Service was a commercial title company that, along with a lender, performed entire real estate transactions with no attorney oversight. *See Buyers Serv.*, 292 S.C. at 428–29, 357 S.E.2d at 16–17. The Court determined Buyers Service had committed UPL by settling the transactions—including ordering and filling out legal instruments relating to the transfer of real property, such as mortgages and deeds; performing title searches and creating abstracts to determine ownership of property; giving legal advice, including as to how purchasers could acquire fee

---

11. Consistent with our approach, many other states also recognize the primacy of consumer protection in residential real estate conveyances and employ a similar analysis in determining the appropriate level of attorney involvement in mortgage transactions. *See, e.g., In re First Escrow, Inc.*, 840 S.W.2d 839, 843–44 (Mo. 1992) (recognizing "the need to balance the protection of the public against a desire to avoid unnecessary inconvenience and expense" and "the duty to strike a workable balance between the public's protection and the public's convenience"); *Bennion, Van Camp, Hagen & Ruhl v. Kassler Escrow, Inc.*, 96 Wash.2d 443, 635 P.2d 730, 733 (1981) (holding lay persons performing tasks relating to real estate transactions were engaged in the unauthorized practice of law and explaining "[i]t is the duty of the court to protect the public from the activity of those who, because of lack of professional skills, may cause injury whether they are members of the bar or persons never qualified for or admitted to the bar." (quotation marks and citation omitted)).

simple title; conducting closings; depositing loan proceeds into its escrow account and disbursing funds; and transferring documents to the land records office for recording—without any lawyer input or supervision.[12] *Id.* Similarly, in *Matrix,* we found the lender engaged in UPL by hiring a non-lawyer "to perform the title search, prepare the documents, and close the refinance loan—all admittedly without the supervision of a licensed attorney." 394 S.C. at 139, 714 S.E.2d at 534. We explained, that because the presence of attorneys in real estate closings is required for the protection of the public, "[l]enders cannot ignore established laws of this state and yet expect this Court to overlook their unlawful disregard." *Id.* at 140, 714 S.E.2d at 535.

As protection of the public is, and has always been, the lodestar of our context-dependent approach to determining whether an activity constitutes the practice of law, this Court has refused to require attorney involvement it did not find necessary to protect the public. For instance, even though the Court has determined that, in the context of a real estate transaction, the disbursement of loan proceeds must be supervised by an attorney, the Court nevertheless refused to "specify the form that supervision must take." *Richardson,* 371 S.C. at 18, 636 S.E.2d at 868. Rather than requiring loan proceeds to pass through a closing attorney's trust account, we instead left it up to the supervising attorneys to decide how best to satisfy their obligations to their clients. *Id.* Additionally, we have held that attorney supervision over loan modifications is not required because the cost to consumers would be greater than any benefit, given the "the existence of a robust regulatory regime and competent non-attorney professionals" involved in the loan-modification process. *Crawford,* 404 S.C. at 47, 744 S.E.2d at 542.

■ Likewise, in *Doe v. McMaster,* we found a lawyer's association with a lender and title company did not violate "the proscription against the unauthorized practice of law." 355 S.C. 306, 316, 585 S.E.2d 773, 778 (2003). *McMaster* was a

---

12. The Court noted that after the proceedings against Buyers Service began, the company started using an attorney to review the closing documents. *Buyers Serv.,* 292 S.C. at 429, 357 S.E.2d at 16. However, the attorney answered only to Buyers Service and never met with the purchaser. *Id.* at 429, 357 S.E.2d at 17.

declaratory judgment action brought by a lawyer seeking a determination of whether his association with a lender and title company was proper under our UPL rules. *Id.* at 309, 585 S.E.2d at 774. We held a lawyer may associate with a lender or title company to perform real estate transactions so long as (1) the lawyer "ensure[s] the title search and preparation of loan documents [were] supervised by an attorney";[13] (2) the lawyer is independent from the lender and "reviews and corrects, if needed, the [loan] documents [prepared by the lender] to ensure their compliance with law";[14] (3) the lawyer "supervise[s] the loan's closing and provide[s] legal advice to the buyer";[15] and (4) the lawyer supervises the recording of the mortgage and other documents.[16] *Id.* at 312–16, 585 S.E.2d at 776–78. Regarding this last step, the Court held it was sufficient that the lawyer "forward[ed] properly executed loan documents to [the title company] with specific instructions regarding how, when[,] and where to satisfy the existing first mortgage and to record the new mortgage and any assignments, if applicable."[17] *See id.* at 316, 585 S.E.2d at 778. Thus, a refinance process does not constitute UPL as long as a licensed South Carolina attorney is involved at each critical stage and exercises independent professional judgment, including making corrections if necessary, at the key points throughout the transaction. To be clear, the lawyer's involvement and supervisory role remain vital and necessary; however, this Court has never found that, as a matter of consumer protection, attorneys are required to personally conduct the myriad clerical tasks required to prepare for a transaction closing.

■ As a result, in evaluating whether challenged conduct constitutes the unauthorized practice of law, this Court carefully considers the specific constellation of facts presented and

---

13. *McMaster,* 355 S.C. at 313, 585 S.E.2d at 776.

14. *Id.* at 314, 585 S.E.2d at 777.

15. *Id.* at 315, 585 S.E.2d at 777.

16. *Id.* at 315–16, 585 S.E.2d at 778.

17. *Id.* at 310, 585 S.E.2d at 775. According to the stipulated facts the lawyer also authorized the lender to disburse funds. *See id.*

legal rights implicated to determine whether the degree of attorney involvement appropriately protects the public from potential legal pitfalls without unduly burdening consumer choice or needlessly increasing consumer costs. It is through this lens we must evaluate the procedures employed by Quicken Loans and Title Source to determine whether either or both of those entities have engaged in UPL in the residential real estate transactions at issue.

### A. Title Search and Certification

■ First, for every transaction challenged in this lawsuit, a South Carolina attorney issued a title review certificate saying he had carefully reviewed the records for the subject property and made a determination as to the ownership of that property. The express purpose of issuing the certificate was "to affirm that the residential title work and search were conducted under the supervision of a South Carolina attorney." *Id.* We do not believe the effectiveness of the title certificates is altered by the fact that a non-lawyer created the abstract reviewed by the attorney, for we have held that "if a licensed attorney reviews the title abstractor's report and vouches for its legal sufficiency by signing the report, title abstractors would not be engaged in the unauthorized practice of law." *Ex parte Watson,* 356 S.C. 432, 436, 589 S.E.2d 760, 762 (2003). Moreover, Aylor, the attorney who issued the title certificates in this case, testified that he always personally reviewed the abstractor's report and only issued a title certificate if he was confident of its legal sufficiency. Aylor said he took steps to ensure he complied with all applicable laws, including South Carolina's rules on UPL.[18] We believe Aylor's conduct satisfies the requirement of *Buyers Service* that examination of title and preparation of abstracts only be performed by, or under the supervision of, a licensed attorney. *See Buyers Service,* 292 S.C. at 432–33, 357 S.E.2d at 18–19.

### B. Preparation of Instruments

■ Next, although Quicken Loans and Title Source were primarily responsible for preparing the loan documents uti-

---

18. Aylor's contract with Title Source also states that Aylor would be responsible for complying with South Carolina's rules regarding UPL, specifically mentioning this Court's rulings in *Buyers Service* and *McMaster.*

lized in these refinance transactions, we find the legal instruments were adequately reviewed (and corrected if necessary) by licensed attorneys prior to the closings. Although Respondents prepared the forms, there is nothing improper about that "as long as an independent attorney reviews and corrects, if needed, the documents." *McMaster*, 355 S.C. at 314, 585 S.E.2d at 777. Here, the closing attorneys all stated that they reviewed the documents for accuracy and compliance with the law prior to closing.

## C.  Closing the Transaction

■ As to the closings, we find the record shows all of the loans were closed with appropriate attorney supervision. *See Buyers Service*, 292 S.C. at 433–34, 357 S.E.2d at 19 (stating that real estate closings must be supervised by an attorney). Each closing attorney signed a Closing Attorney's Statement, indicating he or she had reviewed all of the relevant closing documents including the HUD-1 settlement statement, note, mortgage, and legal description prior to closing. Each attorney also stated that he or she reviewed and explained the documents to the borrowers, answered any questions the borrowers asked, and supervised the borrowers' execution of the documents. Because a licensed attorney who had previously reviewed the closing documents for accuracy and legal sufficiency was physically present at each closing to answer questions and to instruct borrowers in the manner in which to execute the closing documents, there is no basis for a finding of UPL with respect to this step of the challenged transactions. *Id.*; *In re Lester*, 353 S.C. 246, 247, 578 S.E.2d 7, 7 (2003).

## D.  Recording and Disbursement

■ Finally, we find the record shows lawyers authorized and supervised the recording of all necessary documents and the disbursement of funds. *See Richardson*, 371 S.C. at 18, 636 S.E.2d at 868; *Buyers Service*, 292 S.C. at 434, 357 S.E.2d at 19. Each closing attorney testified he or she monitored the disbursement and recordation process to ensure the refinance transaction was properly completed in compliance with South Carolina law. Further, the evidence shows that in each loan transaction here, the closing attorney authorized

Respondents to record documents and disburse proceeds with specific instructions for Respondents to return proof of recordation and disbursement to the closing lawyer upon completion. Specifically, the closing lawyers insisted on receiving a detailed disbursement ledger showing how the loan proceeds were applied, which the lawyers reviewed to confirm loan proceeds were disbursed properly. The closing lawyers also required Respondents to provide the recording date and the book and page numbers of the recorded loan documents, which the lawyers then used to obtain copies of the recorded loan documents to confirm all necessary documents were properly recorded. Indeed, in each of the transactions at issue, the closing attorney's file contained a copy of the recorded mortgage. Because the attorneys were required to verify the proper disbursement of the loan proceeds and that all of the necessary documents were recorded properly in the correct county, there is no basis for finding Respondents committed UPL in this step of the closing process.[19]

## III.

Given the extensive evidence of attorney involvement summarized above, we declare Respondents' conduct not does not constitute UPL. It appears Quicken Loans, Title Source, and those acting on their behalf took appropriate steps to ensure their actions complied with our state's UPL rules, including soliciting opinions from other South Carolina attorneys as to what lawyers must do during real estate transactions to avoid violating South Carolina's UPL rules. The record further reveals Title Source expected the South Carolina attorneys it engaged to take the steps needed to comply with South Carolina law. We do not suggest that such expectations are dispositive. Rather, these expectations must translate into actual compliance with the law. Here, we are firmly persuaded

---

19. To the extent this Court's decision in *In re Breckenridge*, 416 S.C. 466, 787 S.E.2d 466 (2016), may be read to require the closing attorney utilize his or her own trust account to control the disbursement of loan proceeds, we hereby modify that decision. In doing so, we reaffirm our holding in *Richardson* that, in the context of a residential real estate loan closing, the disbursement of loan proceeds constitutes the practice of law and must be supervised by an attorney. *Richardson*, 371 S.C. at 18, 636 S.E.2d at 868. The attorney supervision required under Respondents' refinance model satisfies the *Richardson* standard.

that, in each of the transactions at issue, the residential mortgage refinance practice utilized by Quicken Loans and Title Source, which includes direct and independent attorney supervision at each critical step, complies with the law. Because we find Quicken Loans and Title Source have honored this Court's precedents requiring attorney involvement and allowed those South Carolina attorneys the opportunity to independently exercise their professional judgment, we find the process utilized in these transactions does not constitute UPL.

Likewise, other courts have declined to require more robust attorney involvement under almost identical facts. For example, the Supreme Judicial Court of Massachusetts held that a title insurance company which contracted with lenders to coordinate settlement services in residential mortgage refinance transactions did not engage in UPL by ordering title examinations and abstracts from non-attorney third parties or by preparing HUD-1 and other settlement-related documents. *Real Estate Bar Association for Massachusetts, Inc. v. National Real Estate Information Services*, 459 Mass. 512, 946 N.E.2d 665, 677–79 (2011). In so finding, the court emphasized that both the title examination and the closing documents were reviewed by licensed Massachusetts attorneys prior to closing and that neither the title company nor the lender directed "the attorneys how to conduct the closing or fulfil their legal, professional, and ethical obligations." *Id.* at 530, 946 N.E.2d at 682. So long as a licensed attorney interpreted the legal status of title, reviewed the settlement documents prior to closing, and remained free to exercise independent judgment in fulfilling their professional and ethical obligations, the title insurance company's involvement in coordinating the refinance process did not constitute UPL. As to the issue of whether the title insurance company's activities in contracting with licensed Massachusetts attorneys to attend real estate closings constituted UPL, the court noted that "[w]hen a third party interposes itself between an attorney and a client, the key question is who exercises and retains control over the attorney." *Id.* at 531, 946 N.E.2d at 682–83. The court acknowledged that a third party "may facilitate the creation of a relationship between an attorney and client, and also may pay the legal bills of the client. . . . However, there must be a

genuine attorney-client relationship, and direction and control over the attorney's actions cannot rest with that third party." *Id.* at 531, 946 N.E.2d at 683–84 (explaining "[t]he degree of interposition and the facts of each individual case play a role in determining whether an inappropriate intermediary relationship exists—that is, one in which the intermediary, because of the degree of its control over the attorney, is itself deemed to be engaged in the unauthorized practice of law"). Here, because each attorney involved at every critical point in these challenged transactions remained free to exercise his or her independent professional judgment, the presence of a third party intermediary (such as Title Source) does not transform the practice into UPL.

Moreover, under the residential mortgage refinance process presented here, we believe a finding that Respondents' conduct constituted UPL would mark an unwise and unnecessary intrusion into the marketplace. We believe this is especially so, as the attorney involvement and supervision serve the goal of protecting the public. Once it is determined that sufficient attorney involvement is present and further that the interest of the public is protected, this Court should stay its hand and let the marketplace control. Indeed, there is no allegation here of fault in connection with any title search, closing, disbursement or otherwise—Homeowners do not allege they were harmed in any way by the Quicken Loans model. To the contrary, one homeowner testified she and her husband had no problems with their loan from Quicken Loans and they would refinance with Quicken Loans again if Quicken Loans were able to offer them a better interest rate.

Simply put, we believe requiring more attorney involvement in cases such as this would belie the Court's oft-stated assertion that UPL rules exist to protect the public, not lawyers. *See, e.g., Crawford*, 404 S.C. at 45, 744 S.E.2d at 541 ("The unauthorized practice of law jurisprudence in South Carolina is driven by the public policy of protecting consumers."). In this context, where there is already "a robust regulatory regime[20] and competent non-attorney professionals," *id.* at 47,

---

**20.** Quicken is subject to regulation by, among other things, the Dodd–Frank Wall Street Reform and Consumer Protection Act (Dodd–Frank),

744 S.E.2d at 542, we do not believe requiring more attorney involvement would appreciably benefit the public or justify the concomitant increase in costs and reduction in consumer choice or access to affordable legal services. *Cf. In re Unauthorized Practice of Law Rules*, 309 S.C. at 306, 422 S.E.2d at 124–25 (recognizing the strict licensing requirements for becoming a Certified Public Accountant (CPA) and holding "that allowing CPAs to practice in their areas of expertise, subject to their own professional regulation, will best serve to both protect and promote the public interest").

**DECLARATORY JUDGMENT ISSUED.**

BEATTY, C.J., HEARN, FEW, JJ., and Acting Justice Costa M. Pleicones, concur.

the Truth in Lending Act (TILA), and the Real Estate Settlement Procedures Act (RESPA).